**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MARK B. YONATY,**

                                   **Plaintiff,**

          v.                                              **3:04-CV-605**
                                                          **(FJS/DEP)**

**AMERADA HESS CORPORATION,**

                                   **Defendant.**
_____

**APPEARANCES**                          **OF COUNSEL**

**HINMAN, HOWARD & KATTELL, LLP**        **ALBERT J. MILLUS, ESQ.**
700 Security Mutual Building
80 Exchange Street
Binghamton, New York 13902
Attorneys for Plaintiff

**FRIEDMANN KAPLAN SEILER &**            **PAUL J. FISHMAN, ESQ.**
**ADELMAN LLP**                          **LANCE J. GOTKO, ESQ.**
1633 Broadway
New York, New York 10019
Attorneys for Defendant

**SCULLIN, Chief Judge**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

Plaintiff alleges (1) breach of the contractual duty of good faith; (2) constructive

termination of his franchise without just cause, in violation of New York General Business Law

§ 199-c(1); and (3) constructive termination of his franchise without just cause, in violation of 15

U.S.C. § 2802, the Petroleum Marketing Practices Act ("PMPA").

Currently before the Court are Defendant's motion (1) to dismiss Plaintiff's complaint

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure,[1] (2) for summary judgment

pursuant to Rule 56 of the Federal Rules of Civil Procedure, and (3) in the alternative, to strike

Plaintiff's demand for a jury trial pursuant to Rule 39 of the Federal Rules of Civil Procedure.

## II. BACKGROUND

The following facts are not in dispute.  In 1973, Plaintiff's father became an independent

Hess franchise dealer at a gas station located at 357 State Street in Binghamton, New York.

Pursuant to written agreements, Plaintiff's father rented the Station premises from Defendant and

purchased motor fuel from it for retail sale.  Beginning in the early 1980s, Defendant began

selling gasoline to its dealers at a wholesale cost that was based on "dealer tank wagon"

("DTW") prices.  Under the DTW pricing method, Defendant sets and adjusts the price at which

it sells gasoline to its dealers by reference to the current retail gasoline prices that certain other

retailers charge.  Although the other retailers must be located in each dealer's local area, it is up

to Defendant to select the other retailers whose prices it uses for comparison, and those retailers

include sellers of major brands.  In particular, Defendant establishes the DTW prices that it

charges dealers by subtracting a certain amount per gallon from the current retail prices in each

dealer's local area.

On August 14, 1998, Plaintiff entered into a "Dealer Agreement Gasoline Station" ("1998

Dealer Agreement").  The 1998 Dealer Agreement included the following terms.  First, Plaintiff

---

[1] Although Defendant moves for dismissal pursuant to Rule 12(b)(6), its arguments for dismissal depend upon evidence that is not contained in Plaintiff's pleadings.  Therefore, the Court construes Defendant's motion to dismiss as one for summary judgment.  *See* Fed. R. Civ. P. 12(b).

acknowledged that Defendant made no representations concerning potential income from the

Station's business, prospects for success, possible training and management assistance from

Defendant, or the volume of Defendant's fuel or other products that Plaintiff would be able to

sell at the station.  Second, Plaintiff acknowledged that he had inspected the station and was

taking possession of it "'in good and safe condition and repair.'"  *See* Defendant's Statement of

Material Facts at ¶ 19 (quotation omitted).  Third, Defendant retained the "'sole discretion'"

whether to make capital improvements to the station, and, if Defendant made such

improvements, it would increase the station's rent.  *See id.* at ¶ 20 (quotation omitted).  Fourth,

Plaintiff would pay Defendant $2,007 per month in rent for the station in the first year of the

1998 Dealer Agreement, and Defendant could increase the rent by up to 5% each following year.

Fifth, Defendant's prices to Plaintiff for motor fuel would be the DTW prices that Defendant set,

and all prices were subject to change without notice.  Sixth, the terms of payment were cash on

delivery or such credit terms as Defendant might extend, and Defendant could alter or revoke the

terms of credit at any time.  Seventh, Defendant was not obligated to make any fuel delivery in

any quantity less than a full-tank trailer load.  Eighth, Plaintiff would not occupy or operate the

station other than for the sale of Defendant's fuel and Defendant-approved products.  Ninth,

Plaintiff would keep open and operate the station continuously, without interruption, twenty-four

hours per day, seven days per week.  Tenth, Plaintiff would use the full capacity of the Station's

storage tanks in order to provide adequate inventory to assure delivery of Defendant's fuel to the

public during all hours of operation and would offer for sale at the station all types of

Defendant's fuel that the station was capable of dispensing.  Eleventh, neither Defendant nor

Plaintiff would be liable to the other for lost business or profits or for incidental or consequential

damages.  Twelfth, Plaintiff was forbidden from operating a competing business within a radius

of five miles of the station, although no such prohibition applied to Defendant.  Finally,

Defendant had the right to terminate the Dealer Agreement if Plaintiff failed to perform or

violated any provision of the 1998 Dealer Agreement; if the station's sales fell below 145,000

gallons per month for whatever reason; if Plaintiff's conduct gave rise to the right under any law

or regulation to terminate the 1998 Dealer Agreement; if Plaintiff failed to pay in a timely

manner any indebtedness to Defendant; if Plaintiff became insolvent; or if Plaintiff, by any act or

failure to act, abandoned the station.

On March 30, 2001, Plaintiff executed another Dealer Agreement with Defendant ("2001

Dealer Agreement").  In the 2001 Dealer Agreement, Plaintiff again acknowledged that he had

inspected the station and was taking possession of it "'in good and safe condition and repair.'"

*See id.* at ¶ 36 (quotation omitted).  By summer 2002, Plaintiff was aware that "'he could not

compete with Defendant's own stations.'"  *See id.* at ¶ 38 (quotation omitted).  Although the

dealer agreements allowed Defendant to increase Plaintiff's rent by 5% per year, Defendant

never increased Plaintiff's original monthly rent of $2,007.  Although both Dealer Agreements

entitled Defendant to demand cash on delivery, Defendant voluntarily decided to permit Plaintiff

to purchase gasoline on credit.  In August 2003, Plaintiff stopped selling gasoline and closed the

station.  On August 19, 2003, Plaintiff wrote to Defendant:

> "As I advised you by telephone, I am unable to purchase gasoline and
> diesel fuel from Hess, since Hess is no longer willing to extend me credit.
> I further advised you that I am now out of product.  Accordingly, my
> business is done, and our relationship has effectively ended.  Therefore,
> please send a representative from the company to take possession of my
> station."

*See id.* at ¶ 46 (quotation omitted).

## III. DISCUSSION

**A.      Defendant's motion for summary judgment**

*1. Standard of review*

A court may grant summary judgment when the moving party carries its burden of showing the absence of a genuine issue of material fact. *See* Fed. R. Civ. P. 56(c).  In making this determination, the court must resolve all ambiguities and draw all reasonable inferences in a light most favorable to the non-moving party.  *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted).  If the moving party has met its burden, the nonmoving party may not rely upon his pleadings but must come forward with specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e).

*2. PMPA preemption*

*a. Plaintiff's breach-of-contract claim*

Plaintiff's first claim for relief alleges that Defendant breached the dealer agreements by (1) pricing its gasoline at unreasonable levels, (2) underselling Plaintiff at its nearby stores, (3) preventing Plaintiff from expanding his product line, (4) failing to upgrade and maintain the station, (5) neglecting Plaintiff and adopting an adversarial attitude towards him, (6) imposing onerous credit terms on Plaintiff, (7) failing to deliver gasoline in a timely fashion, (8) offering and promoting services at its company stores without providing those services to Plaintiff, and (9) actively seeking to eliminate its independent dealer network.  Defendant contends that the PMPA preempts Plaintiff's breach of contract claim.

-5-

The PMPA provides, in pertinent part, that

> [t]o the extent that any provision of this subchapter applies to the termination . . . of any franchise . . . no State . . . may adopt, enforce, or continue in effect any provision of law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination . . . of any such franchise . . . unless such provision of such law or regulation is the same as the applicable provision of this subchapter.

15 U.S.C. § 2806(a)(1).  The PMPA only preempts state-law provisions related to the termination of a franchise that are not identical to the applicable PMPA provisions.  Therefore, the Court find that the PMPA does not preempt Plaintiff's breach-of-contract claim because that claim does not involve the termination of the franchise relationship and is independent of his constructive termination claims pursuant to the New York General Business Law and the PMPA.

### b. Plaintiff's New York General Business Law claim

Plaintiff's second claim for relief alleges that Defendant's "onerous pricing policy, culminating in its refusal to extend credit to plaintiff and plaintiff's consequent inability to continue its business, constituted a constructive termination and cancellation without just cause of plaintiff's franchise with defendant, in violation of New York General Business Law § 199-c(1)." *See* Dkt. No. 1 at ¶ 54.  Defendant contends that the PMPA preempts Plaintiff's New York General Business Law claim.

The PMPA and New York General Business Law § 199-c(1) both identify the appropriate grounds for a franchisor's termination of a franchise.  The PMPA provides, in pertinent part, that

> the following are grounds for termination of a franchise or nonrenewal of a franchise relationship:

(A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship . . . .

(B) A failure by the franchisee to exert good faith efforts to carry out the provisions of the franchise . . . .

(C) The occurrence of any event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal is reasonable . . . .

* * *

15 U.S.C. § 2802(b)(2).  Section 199-c(1) of New York General Business Law provides, in

pertinent part, that

[e]xcept as otherwise provided in this article, no distributor or agent shall terminate, cancel or refuse to renew any franchise except for good cause, which shall include but not be limited to:

(a) The dealer's failure to comply with a substantive requirement of a franchise agreement;

(b) The dealer's failure to act in good faith in carrying out the terms of the franchise.

* * *

N.Y. Gen. Bus. Law § 199-c(1) (McKinney 2005).  Section 199-c(1)'s provisions are not

identical to the applicable PMPA provisions.  Furthermore, the respective notice requirements

are significantly different.  *See* 15 U.S.C. § 2802(b)(2); N.Y. Gen. Bus. Law § 199-c(3).

Therefore, the Court finds that the PMPA preempts Plaintiff's New York General Business Law

§ 199-c(3) claim.  *See Pennzoil Co. v. Carlson*, 158 A.D.2d 206, 220 (4th Dep't 1990) (citations

omitted).  Accordingly, the Court grants Defendant's motion for summary judgment with respect

to that claim.

### 3. Plaintiff's breach-of-contract claim

As the Court noted above, Plaintiff has identified several alleged actions Defendant took

that he believes breached the Dealer Agreements.  More particularly, Plaintiff asserts that

Defendant's actions violated its duty of good faith that was implicit in the dealer agreements.

The New York Court of Appeals has held that

> [i]mplicit in all contracts is a covenant of good faith and fair dealing in the
> course of contract performance. . . .
>
> Encompassed within the implied obligation of each promisor to
> exercise good faith are "'any promises which a reasonable person in the
> position of the promisee would be justified in understanding were
> included'" . . . .  This embraces a pledge that "neither party shall do
> anything which will have the effect of destroying or injuring the right of
> the other party to receive the fruits of the contract" . . . .  Where the
> contract contemplates the exercise of discretion, this pledge includes a
> promise not to act arbitrarily or irrationally in exercising that discretion . . .
> .  The duty of good faith and fair dealing, however, is not without limits,
> and no obligation can be implied that "would be inconsistent with other
> terms of the contractual relationship" . . . .

*Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (internal quotations and other internal

citations omitted).

### a. gasoline price

Plaintiff alleges that Defendant priced its gasoline "at unreasonable levels that did not

allow him to earn a profit upon market prices in the Binghamton area market."  *See* Dkt. No. 1 at

¶ 42(a).  The 1998 and 2001 Dealer Agreements contain identical motor fuel price provisions:

"Hess's dealer tankwagon prices in the marketing area of the Station, as determined by Hess, for

the grades and quantities delivered, in effect at the time of delivery . . . ."  *See* Dkt. No. 11 at

Exhibits "D" at 2, "E" at 2.  The language of this provision, "Hess' dealer tankwagon prices in

-8-

the marketing area of the Station," although it does not provide a formula for determining the

DTW prices, does indicate that the DTW prices were, at a given time, uniform everywhere in the

"marketing area of the Station . . . ."

Section 2-305 of the Uniform Commercial Code provides, in pertinent part, that "[a] price

to be fixed by the seller or by the buyer means a price for him to fix in good faith."  N.Y. U.C.C.

§ 2-305(2) (McKinney 2005).  Official Comment 3 to this section provides, in pertinent part, that

> [g]ood faith includes observance of reasonable commercial standards of
> fair dealing in the trade if the party is a merchant.  (Section 2-103).  But in
> the normal case a "posted price" or a future seller's or buyer's "given
> price," "price in effect," "market price," or the like satisfies the good faith
> requirement.

*Id.* cmt. 3 (McKinney 2005).

Unfortunately, despite the clear applicability of § 2-305(2) and Comment 3, neither party

has briefed how these provisions apply to the facts of this case.  Fortunately, many courts,

although no New York state courts, have applied these provisions to cases involving gasoline

station franchises with open price terms.  *See Callahan v. Sunoco, Inc.*, Nos. Civ. A. 03-4461,

Civ. A. 04-2915, Civ. A. 04-2916, Civ. A. 04-2918, Civ. A. 04-2919, Civ. A. 04-2920, Civ. A.

04-2921, Civ. A. 04-2922, Civ. A. 04-2923, 2005 WL 994615, *3 (E.D. Pa. Apr. 28, 2005)

(noting that the court had not found any New York cases analyzing similar gasoline station

franchise claims).  The most recent decision in this area is *Callahan*, which applied New Jersey

and New York law.  The court in that case followed the leading New Jersey case in this area,

*Wilson v. Amerada Hess Corp.*, 773 A.2d 1121 (N.J. 2001).  *Callahan* quoted the most pertinent

conclusions of *Wilson*:

> "a party exercising its right to use discretion in setting price under a

> contract breaches the duty of good faith and fair dealing if that party
> exercises its discretionary authority arbitrarily, unreasonably, or
> capriciously, with the objective of preventing the other party from
> receiving its reasonably expected fruits under the contract." . . . . "Without
> bad motive or intention, discretionary decisions that happen to result in
> economic disadvantage to the other party are of no legal significance."

*Callahan*, 2005 WL 994615, *3 (quotations omitted). *Callahan* proceeded to predict that New

York courts would follow *Wilson*'s reasoning and to conclude that "for their claims to survive

summary judgment, plaintiffs must produce some evidence suggesting that, in establishing DTW

prices, Sunoco exercised its discretionary authority under the DFAs 'arbitrarily, unreasonably, or

capriciously, with the objective of preventing the [dealers] from receiving [their] reasonably

expected fruits under the contract.'" *Id.* (quotation omitted).

Not all courts have followed *Wilson* and *Callahan* in concluding that motive is relevant to

good faith.  The Supreme Court of Texas recently found that "the majority of decisions suggest

that a commercially reasonable DTW price, that is, one within the range of DTW prices charged

by other refiners in the market, is a good faith price under section 2.305 absent some evidence

that the refiner used pricing to discriminate among its purchasers."  *Shell Oil Co. v. HRN, Inc.*,

144 S.W.3d 429, 434 (Tex. 2004) (citations omitted).[2]  In clarifying the meaning of a

---

[2] One of the cases that *Shell Oil Co.* cites is *Wayman v. Amoco Oil Co.*, 923 F. Supp.
1322 (D. Kan. 1996), which, after reviewing the legislative history of § 2-305(2) of the Uniform
Commercial Code, concluded that

> [i]t is abundantly clear from these statements that the chief concern of the
> UCC Drafting Committee in adopting § 2-305(2) was to prevent
> *discriminatory* pricing – i.e., to prevent suppliers from charging two
> buyers with identical pricing provisions in their respective contracts
> different prices for arbitrary or discriminatory reasons.

*Id.* at 1346-47.

commercially reasonable price, the court noted that it is not the same as "a fair market price or the lowest price available." *Id.* at 437 (citations omitted). It also noted that a commercially reasonable price is not necessarily a price at which each franchisee can remain competitive. *See id.*

The Sixth Circuit has held that, in order for a plaintiff to prove that a defendant violated its good faith duty to set an open price term, it must prove that the defendant "violated reasonable commercial standards of fair dealing in the gasoline marketing industry." *Tom-Lin Enters., Inc. v. Sunoco, Inc. (R&M)*, 349 F.3d 277, 282 (6th Cir. 2003) (applying Ohio law) (citing *Schwartz v. Sun Co., Inc.*, 276 F.3d 900, 905 (6th Cir. 2002) (applying Michigan law)). Therefore, a plaintiff must "produce background evidence of the manner in which other marketers of gasoline in [the relevant marketing area] set their prices." *Id.* (citing [*Schwartz*, 276 F.3d] at 903, 905).

Although courts have adopted varying approaches in analyzing whether gasoline franchisors have set prices in good faith, it is clear that, in order for Plaintiff to maintain a claim under any of these approaches, he must produce some evidence of improper motive, discriminatory pricing, or the pricing practices of other franchisees. He has done none of these. He has submitted an affidavit, in which he states that

> [t]he most important factor leading to the demise of my operation was Hess's pricing policies. Over time, the pricing became very onerous. While Hess ostensibly maintained the 6/8/10 formula when pricing its gasoline, in reality it became impossible for me to live with those margins. The most important factor in that regard was Hess's aggressive pricing policies at its own stations, several of which are within easy driving distance of the State Street station . . . .

-11-

*See* Affidavit of Mark B. Yonaty, sworn to December 1, 2004 ("Plaintiff Aff."), at ¶ 12.[3]

Plaintiff does not indicate what he means by Defendant's purported "aggressive policies."

Presumably he means that Defendant's company stations were underselling him.  He asserts that

Defendant's pricing policies caused his gasoline sales by volume to drop to less than one quarter

of what they were at their peak.  *See id.* at ¶ 13.  However, he also states that his "station

continued to service a high volume of customers.  Based on my conversations with managers of

other Hess stations, I was led to believe that I had a higher volume of gasoline sales than most of

the other Hess stations in the area."  *See id.* at ¶ 25.  Furthermore, Plaintiff has presented no

evidence about the pricing policies of other gasoline franchisors operating in the Binghamton

area or about the prices that Defendant charged its company stations.

Plaintiff's claim that Defendant acted in bad faith in setting its DTW prices depends

largely on his contention that Defendant has a broad plan to force its franchisees out of business

in order to increase the percentage of its operations that occur through its company stations.  As

the cases the Court cited above indicate, such a contention, if proven, might form the basis for a

claim under New Jersey law; however, it would not be relevant to an assessment of good faith

under Texas, Michigan, or Ohio law.  Nonetheless, Plaintiff's submissions do not raise a genuine

issue with respect to Defendant's motive.  He has submitted the affidavit of Anthony Manley,

who owns twenty gasoline stations in the Binghamton area.  *See* Affidavit of Anthony Manley,

sworn to November 29, 2004, at ¶ 2.  Mr. Manley describes two other of Defendant's former

---

[3] "Generally, Hess set its gasoline prices so that dealers would have a margin of $.06 on regular gasoline, $.08 on regular plus gasoline, and $.10 on premium . . . over the current retail gasoline prices in the market area."  *See* Affidavit of Gavriel Yonaty ("Gavriel Yonaty Aff."), sworn to December 1, 2004, at ¶ 9.

franchisees with whom he is familiar and who found it impossible to remain profitable. *See id.* at ¶¶ 9-10. His affidavit does not make clear how much of his familiarity with these franchisees is based on personal knowledge and how much is hearsay. Mr. Manley also notes that, in or around 1988, Defendant purchased an Atlantic bulk storage facility and eleven Atlantic gasoline stations in Broome County. *See id.* at ¶ 8. He states that, as part of this purchase, Defendant required Atlantic to eliminate dealer-operated repair facilities from the stations. *See id.* Atlantic sought to do so by buying out its franchisees, including three that Mr. Manley owned. *See id.* Finally, Plaintiff's father asserts that, over the years, the gasoline industry has changed from one that independent franchises dominate to one that convenience stores dominate. *See* Gavriel Yonaty Aff. at ¶ 10.

Contrary to Plaintiff's contention that Defendant is pursuing a general scheme to move its operations from independent franchises to company stations, Defendant has submitted evidence that, as of December 31, 1991, 80% of its stations were company-operated and that, as of December 31, 2003, 68% of its stations were company-operated. *See* Dkt. No. 11 at Exhibits "K" and "L." Regardless, even if the Court draws every reasonable inference in favor of Plaintiff, he has still failed to produce any evidence that Defendant exercised its discretion to determine the DTW prices "arbitrarily, unreasonably, or capriciously . . . ." *Wilson*, 773 A.2d at 1130. Without some evidence about Defendant's profit margins, Defendant's company station prices, the DTW prices of other franchisors operating in the Binghamton area, the retail prices at other stations in the Binghamton area, and/or the relative percentage that the DTW prices constituted of Plaintiff's expenses, the Court has no means of assessing the propriety of Defendant's pricing policies. Therefore, the Court finds that Plaintiff has not shown the

-13-

existence of a genuine issue with respect to his claim that Defendant acted in bad faith in setting the DTW prices.

### b. underselling by Defendant's nearby company stations

As the Court noted above, Plaintiff has presented no evidence with respect to the specific prices that Defendant's company stations charged.  He asserts generally that Defendant pursued an aggressive pricing policy but then states that he was selling more gasoline than most of Defendant's other stations.  *See* Plaintiff Aff. at ¶¶ 12, 25.  Furthermore, when Plaintiff speaks of Defendant's stations that "are within easy driving distance" of his own, he only identifies stations that he describes as being "perhaps a mile away."  *See id.* at ¶ 12.  Although some customers will presumably drive a distance to purchase gasoline, if the nearest competing station that Defendant operated was about a mile away from Plaintiff's, it is not clear that the two stations were substantially serving the same market.  Therefore, Plaintiff has failed to produce evidence that shows by how much Defendant's company stores were underselling him, to what extent any such underselling was attributable to Defendant's pricing policy, or that his reduction in sales correlated with an increase in sales at Defendant's company stations.[4]  Consequently, the Court finds that Plaintiff has not shown the existence of a genuine issue with respect to his claim that Defendant's nearby company stations undersold him in bad faith.

---

[4] Although Plaintiff states that "[r]egular long time customers would often ask me why they should drive to my station to pay significantly more for gasoline that they could purchase at another Hess station closer to their homes," *see* Plaintiff Aff. at ¶ 12, this statement is hearsay and inadmissible.  *See* Fed. R. Civ. P. 56(e).

### *c. expansion of Plaintiff's product line*

Plaintiff contends that Defendant acted in bad faith in preventing him from expanding his product line.  He states that

> I tried to expand and diversify my product mix to compete with convenience store operators such as Hess.  However, Hess required me to purchase all of my non-gasoline products from "designated distributors," . . . . Those vendors charge[d] significant markup and had minimum volume requirements that made it impossible for me to buy from them to any meaningful extent.

> 15.    At the same time Hess prohibited me from purchasing identical products from local vendors at significantly reduced prices.  As a result, for example, I could not make any significant oil sales because customers could purchase oil at much lower prices from a nearby K-Mart and auto supply houses.

*See* Plaintiff Aff. at ¶¶ 14-15.  Both Dealer Agreements contained identical provisions with respect to non-fuel products:

> All non-Fuel products purchased by Dealer from Hess hereunder are sometimes collectively referred to as "Products."  At Hess's option, Hess may require that Dealer purchase Products from a merchandise distributor designated by Hess in writing ("Authorized Distributor").  Dealer will sell at retail at the Station a representative quantity of HESS® motor oil, automatic transmission fluid and other HESS® products purchased only from Hess or an Authorized Distributor. . . .

> Dealer will not occupy or operate the Station other than for the sale of HESS® Fuel and Products or such other products as may be approved in writing by Hess . . . .

*See* Dkt. No. 11 at Exhibits "D" at 2, "E" at 2.  Both Dealer Agreements also provided that

> Dealer will not sell or offer for sale any tires, batteries or accessories, or any other items not normally sold at HESS® retail stations.  Dealer will not sell or offer for sale items such as, but not limited to, cigarettes, candy and soda, except in such locations and by such means as approved by Hess in writing.

* * *

> (x)      Dealer will not sell, offer for sale, or permit the use,
> serving, distribution or consumption of liquors or controlled substances at
> the Station . . . .

*See id.* at Exhibits "D" at 3, "E" at 3-4.

Plaintiff does not state that he ever requested Defendant's permission to purchase non-fuel products elsewhere.  He only asserts that, when he set up a table with certain consumer items on it, Defendant's representative told him to take it down.  *See* Plaintiff Aff. at ¶ 22.  Even if the Court draws every reasonable inference in Plaintiff's favor, he has failed to raise a genuine issue with respect to Defendant's bad faith.  Defendant's discretion in approving merchandise distributors and products was clearly indicated in the Dealer Agreements.  Furthermore, Defendant had good reasons, namely that of avoiding products liability claims, for the limitations that it imposed.  Finally, Plaintiff has not presented any evidence of a specific request to expand his product line that he unsuccessfully made that might indicate Defendant's bad faith. Therefore, the Court finds that Plaintiff has not shown the existence of a genuine issue with respect to his claim that Defendant limited his product line in bad faith.

### d. upgrading and maintenance of station

Plaintiff contends that Defendant neglected the physical condition of his station.  Plaintiff makes several relevant assertions:

> 16.      I also sought to convince defendant to improve the physical
> components of the station . . . .  Hess designated the retail areas a "snack
> bar", and made no structural changes that would have allowed me to
> compete in any meaningful way with convenience stores.  Hess provided
> no refrigeration or cooking facilities.  Indeed, the building itself was too
> small to support meaningful retail sale, but Hess took no steps to expand

it.

17.     Moreover, I asked repeatedly for the installation of a canopy over his [sic] pumps, something that is found at virtually every convenience store, but Hess refused to install one.

18.     At one point, I experienced a fire in the station's electrical service.  I was advised by the Electric Company representative that the service was overloaded.  The electrical service, in fact, was wholly inadequate to support the increasing burdens placed upon it over the years.  I advised my contacts at Hess, who did nothing to modernize the service.

19.     My gasoline pumps were outdated and broke down with unacceptable frequency.  At the same time, Hess was installing state-of-the-art pumps at their own stations.  Hess's own maintenance contractor . . . had increasing difficulty finding parts, and repeatedly recommended to Hess that the pumps be replaced.  I also asked Hess to upgrade the pumps, but Hess did nothing.

20.     Another significant problem involved the concrete curbs around the pump islands.  I believe they were the original curbs from approximately the mid-1960's, when the station was constructed.  They had deteriorated considerably, and caused physical injury and property damage to customers.  The station was generally deteriorating, and I asked Hess to give the station the attention it needed and that Hess had given it in the past.  Hess did nothing of substance to upgrade the facility. . . .

* * *

24.     I then began discussing the poor and outdated condition of the facility, and Mr. Fish told me that Binghamton was "not a priority market," and that Hess would do nothing to upgrade the facility.  This did not make sense to me, inasmuch as Hess had been, and was in the process of, upgrading its many stations in the area. . . .

* * *

26.     Mr. Fish indicated that they would "look into" the obsolete pumps and "do something" about the curbs, but Hess thereafter did nothing about the pumps and made only superficial and wholly inadequate repairs to the curbs. . . .

*See* Plaintiff Aff. at ¶¶ 16-20, 24, 26.

-17-

In both the 1998 and 2001 Dealer Agreements, Plaintiff "acknowledge[d] inspecting the Station and taking possession of the Station in good and safe condition and repair." *See* Dkt. No. 11 at Exhibits "D" at 1, "E" at 1.  Both Dealer Agreements also gave Defendant sole discretion to decide to make capital improvements to the Station.  *See id.*  They further provided that "Dealer will not change, alter or construct, or make (or cause to be made) any change, addition or improvement in or to the Station.  Hess may add to or replace its existing buildings, equipment and any other facilities on the Station . . . ."  *See id.* at Exhibits "D" at 5, "E" at 5.

However, both Dealer Agreements also provided that

> Hess and Dealer will assume the responsibilities as allocated on Exhibit "B" attached hereto for the care and maintenance of the Station.  If Hess determines that any repairs which would otherwise be its responsibility under Exhibit "B" would not be economically feasible to make, Hess may so notify Dealer, in writing, and cancel this Agreement on such notice as is reasonable under the circumstances.

*See id.*  Exhibit B to both Dealer Agreements gave Defendant total responsibility for all electrical wiring systems, paving and concrete repairs, pump and tank repairs, dispensers, pumps, pumping units, and structural defects.  *See id.* at Exhibits "D" at 14, "E" at 15.  Plaintiff's assertions that Defendant failed to repair the electrical system and pumps and inadequately repaired the curbs are indicative of Dealer's breaches of the Dealer Agreements.  Although it is not yet clear whether Plaintiff will be able to establish damages that resulted from these breaches, Defendant has not raised proof of damages as an issue in its motion papers.  Therefore, the Court find that, as of this time, Plaintiff has shown a genuine issue with respect to whether Defendant failed to maintain the station in bad faith.

### e. onerous credit terms

Plaintiff states that, "as 2003 progressed, Hess began to extend credit to me on an on-again, off-again basis that became very confusing and impossible to live with.  I would order gasoline, and then find at the last minute that Hess was refusing to deliver, many times leaving me completely without any product to sell, causing me to shut down the station and send away customers."  *See* Plaintiff Aff. at ¶ 34.  Both Dealer Agreements provided that "[t]erms of payment will be cash on delivery, or on such credit terms as may be extended by Hess, which terms of credit may be altered or revoked by Hess at any time."  *See* Dkt. No. 11 at Exhibits "D" at 2, "E" at 2.  Although Defendant was certainly not contractually obligated to extend credit to Plaintiff, if it chose to do so, it had to observe honesty in fact and norms of commercial reasonableness in doing so.  Plaintiff's description of Defendant's conduct is not unambiguous.  However, if the Court draws every reasonable inference in favor of Plaintiff, his evidence is sufficient to raise a genuine issue.  Therefore, the Court find that, as of this time, Plaintiff has shown the existence of a genuine issue with respect to his claim that Defendant failed to exercise good faith in its extension of credit to him.

### f. timely delivery of gasoline

Plaintiff has attached to his affidavit a letter that he wrote to Defendant on October 25, 2001.  *See* Dkt. No. 18 at Pt. 8.  In it, he states that "[s]everal times in recent months, my deliveries have arrived hours after I have run out of gasoline."  *See id.* at 2.  Both Dealer Agreements provide that "Dealer will purchase from Hess and Hess will sell and deliver to Dealer under this Agreement Dealer's requirements of motor fuel . . . ."  *See* Dkt. No. 11 at

Exhibits "D" at 2, "E" at 2.  The Dealer Agreements contain no provisions governing how long after Plaintiff ordered gasoline Defendant would deliver it.

New York law provides that "[t]he time for shipment or delivery or any other action under a contract if not provided in this Article or agreed upon shall be a reasonable time."  N.Y. U.C.C. § 2-309(1) (McKinney 2005).  If the Court draws every reasonable inference from Plaintiff's letter, he has raised a genuine issue with respect to whether Defendant delivered gasoline to him at a reasonable time.  Therefore, the Court finds that Plaintiff has a raised a genuine issue with respect to his claim that Defendant exercised bad faith in failing to deliver gasoline to him in a timely manner.

### g. services at company stores

Plaintiff asserts that "Hess entered into an agreement with the United States Government's fleet credit card company, Voyager, to accept the card at its company owned stores.  Hess refused to allow independent dealers to participate in the program.  As a result, I lost the lucrative Post Office business."  *See* Plaintiff Aff. at ¶ 27.  No specific provision of the Dealer Agreements appears to address this issue.  However, Defendant's overall performance of the contract was subject to the requirement of good faith.  Even if the Dealer Agreements gave Defendant discretion to determine whether to offer particular services to its franchisees, it could not act "arbitrarily or irrationally in exercising that discretion."  *Dalton*, 87 N.Y.2d at 389 (citation omitted).  Defendant has presented no reason why it offered the federal government credit card program to its company stores but not to its franchisees.  Therefore, Defendant has not shown the absence of a genuine issue with respect to whether it acted in bad faith in offering

this service to its company stores but not to its franchisees.

### h. summary

For the reasons stated above, the Court denies Defendant's motion for summary judgment with respect to Plaintiff's claims that it breached its good faith duty under the Dealer Agreements by (1) failing to maintain his station, (2) acting in bad faith in its extension of credit to him, (3) failing to deliver gasoline to him at a reasonable time, and (4) providing services to its company stores but not to its franchisees.  The Court grants Defendant's motion for summary judgment with respect to Plaintiff's claims that it breached its good faith duty under the Dealer Agreements by (1) setting the DTW prices in bad faith, (2) underselling him at its nearby company stores, and (3) limiting his product line.[5]

### 4. Plaintiff's PMPA claim

Plaintiff's third claim for relief states that

> [t]he totality of defendant's conduct as described herein, including but not limited to its onerous pricing policy, culminating in its refusal to extend credit to plaintiff and plaintiff's consequent inability to continue in business, constituted a willful constructive termination and cancellation without just cause of plaintiff's franchise with defendant, in violation of 15 U.S.C. § 2802.

*See* Dkt. No. 1 at ¶ 61.  Section 2802 provides, in pertinent part, that

> [e]xcept as provided in subsection (b) of this section and section 2803 of

---

[5] Plaintiff's complaint also alleges that Defendant breached its contractual duty of good faith by neglecting him, adopting an adversarial stance towards him, and pursuing a policy of eliminating its franchisees.  However, only Defendant's specific acts or omissions could breach the Dealer Agreements and injure Plaintiff.  These allegations either fail to allege specific acts or omissions or state more generally the acts or omissions that Plaintiff alleges elsewhere in his complaint.

> this title, no franchisor engaged in the sale, consignment, or distribution of motor fuel in commerce may—
>
> > (1) terminate any franchise (entered into or renewed on or after June 19, 1978) prior to the conclusion of the term, or the expiration date, stated in the franchise . . .

15 U.S.C. § 2802(a).

The Second Circuit has not yet considered whether a "constructive termination" qualifies as a termination under the PMPA.  The most recent circuit case to consider this question is *Abrams Shell v. Shell Oil Co.*, 343 F.3d 482 (5th Cir. 2003).  In that case, the court noted that, although a previous Fifth Circuit case had "declin[ed] to decide whether the PMPA permitted constructive termination claims," it had

> indicated that it would only recognize such a claim if the plaintiffs alleged a breach of the franchise, which "consists of three core components: a contract to use the refiner's trademark, a contract for the supply of motor fuel to be sold under the trademark, and a lease of the premises at which the motor fuel is sold."

*Id.* at 487 (quotation and footnote omitted).  If a claim for constructive termination is cognizable under the PMPA, a plaintiff would have to allege that the defendant breached one of these three core components.  *Id.* (citation omitted).  In a footnote, the court noted that

> [t]his approach is largely consistent with the decisions of our sister circuits, though most circuits have only considered constructive termination claims in cases where the franchisor assigned the franchise agreement to a third party.  *See, e.g., Shukla v. BP Exploration & Oil*, 115 F.3d 849, 854-57 (11th Cir. 1997); *Chestnut Hill Gulf, Inc. v. Cumberland Farms, Inc.*, 940 F.2d 744, 750-52 (1st Cir. 1991); *May-Som Gulf, Inc. v. Chevron U.S.A., Inc.*, 869 F.2d 817, 918-18 (6th Cir. 1989); *Barnes v. Gulf Oil Corp.*, 795 F.2d 358, 362-64 (4th Cir. 1986).  In such cases, a constructive termination claim also exists where the assignment violates applicable state law. . . .

*Id.* at 487-88 n.13 (citations omitted).  Since the approach of the Fifth Circuit and of those cases

-22-

that it cites in *Abrams Shell* appears to be consistent with the PMPA's definition of "franchise,"[6]

the Court will follow this approach.

The Court has already found that there are genuine issues with respect to whether

Defendant delivered fuel to Plaintiff in a timely fashion and fulfilled its obligations to maintain

the stations. Therefore, there are genuine issues with respect to whether Defendant breached its

contract to supply motor fuel and its lease of the station premises. Accordingly, the Court denies

Defendant's motion for summary judgment with respect to Plaintiff's PMPA claim.

**B.      Defendant's motion to strike Plaintiff's demand for a jury trial**

Both Dealer Agreements provide that "[b]oth parties waive any right they may have to a

jury trial in any disputes hereunder." *See* Dkt. No. 11 at Exhibits "D" at 12, "E" at 12. Plaintiff

only challenges the applicability of this waiver to his PMPA claim. The Court concludes that the

waiver does not encompass Plaintiff's PMPA claim. First, Plaintiff's PMPA claim arises under

---

[6] Section 2801(1) provides, in pertinent part, that

> (A) The term "franchise" means any contract . . . under which a refiner
> or distributor (as the case may be) authorizes or permits a retailer or
> distributor to use, in connection with the sale, consignment, or distribution
> of motor fuel, a trademark which is owned or controlled by such refiner or
> by a refiner which supplies motor fuel to the distributor which authorizes
> or permits such use.

> (B) The term "franchise" includes . . . any contract under which a retailer
> or distributor (as the case may be) is authorized or permitted to occupy
> leased marketing premises, which premises are to be employed in
> connection with the sale, consignment, or distribution of motor fuel under
> a trademark which is owned or controlled by such refiner or by a refiner
> which supplies motor fuel to the distributor which authorizes or permits
> such occupancy . . . .

15 U.S.C. § 2801(1).

federal law rather than under the Dealer Agreements.  Second, the PMPA provides that "[n]o franchisor shall require, as a condition of entering into or renewing the franchise relationship, a franchisee to release or waive – (A) any right that the franchisee has under this subchapter or other Federal law . . . ."  15 U.S.C. § 2805(f)(1).  A "franchisee has a right to a jury trial for actual damages . . . under the [PMPA]."  *Thompson v. Kerr-McGee Refining Corp.*, 660 F.2d 1380, 1386 (10th Cir. 1981).  Therefore, even if the waiver of jury trial in the Dealer Agreements would otherwise apply to Plaintiff's PMPA claim, it is ineffective as a waiver of a right that Plaintiff has under the PMPA.  Accordingly, the Court grants Defendant's motion to strike Plaintiff's demand for a jury trial with respect to Plaintiff's breach-of-contract claims and denies Defendant's motion with respect to Plaintiff's PMPA claims.

## IV. CONCLUSION

After carefully considering the file in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Defendant's motion for summary judgment with respect to Plaintiff's New York General Business Law claim is **GRANTED**; and the Court further

**ORDERS** that Defendant's motion for summary judgment with respect to Plaintiff's breach-of-contract claim is **DENIED** with respect to Plaintiff's allegations that Defendant failed to maintain his station, acted in bad faith in its extension of credit to him, failed to deliver gasoline to him at a reasonable time, and provided certain services to its company stores but not to its franchisees; and the Court further

**ORDERS** that Defendant's motion for summary judgment with respect to Plaintiff's

-24-

breach-of-contract claim is **GRANTED** with respect to Plaintiff's allegations that Defendant set the DTW prices in bad faith, undersold him at its nearby company stores, and limited his product line; and the Court further

ORDERS that Defendant's motion for summary judgment with respect to Plaintiff's PMPA claim is **DENIED**; and the Court further

ORDERS that Defendant's motion to strike Plaintiff's demand for a jury trial is **GRANTED** with respect to Plaintiff's breach-of-contract claims and is **DENIED** with respect to Plaintiff's PMPA claim.

**IT IS SO ORDERED.**

Dated: June 20, 2005
        Syracuse, New York

_____
Frederick J. Scullin, Jr.
Chief United States District Court Judge